IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA BREUNLIN, | ) | |
| | ) | Case No. 07 C 4627 |
| Plaintiff, | ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| VILLAGE OF OAK PARK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cynthia Breunlin ("Breunlin") filed suit against Defendant Village of Oak Park ("Oak Park") under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, asserting a single claim for retaliatory discharge. Oak Park now moves for summary judgment on the claim, while Breunlin moves for partial summary judgment on two elements of the claim. For the reasons stated, Breunlin's motion for partial summary judgment is denied and Oak Park's motion for summary judgment is granted.

## STATEMENT OF UNDISPUTED FACTS

*I. Background*

On November 17, 1997, Oak Park hired Breunlin as a Housing Programs Manager to continue its housing programs that had earned a national reputation. (Pl. 56.1 Resp. ¶¶ 4, 5; Def. 56.1 Resp. ¶ 1.)[1] At the time Breunlin took the position, Oak Park had already established its Single Family

---

[1] Citations to "Plaintiff's Responses to Defendant's Rule 56.1 Statement" have been abbreviated to "Pl. 56.1 Resp. ¶ __." Likewise, citations to "Defendant's Response to Plaintiff's Statement of Uncontested Facts in Support of Her Motion for Partial Summary Judgment" have been abbreviated to "Def. 56.1 Resp. ¶ __," and citations to "Defendant's Response to Plaintiff's Statement of Additional Facts Pursuant to Local Rule 56.1(b)(3)(B)" have been abbreviated to "Def. Add'l 56.1 Resp. ¶ __." The Court notes with considerable displeasure that the parties have failed

1

Rehabilitation Program ("SFRP") which had received commendations from the U.S. Department of Housing and Urban Development ("HUD") and Cook County. (Pl. 56.1 Resp. ¶ 5.) The SFRP provided federally funded loans to moderate and low income homeowners so they could make repairs to bring their homes into compliance with local building codes. (Pl. 56.1 Resp. ¶ 9.) Oak Park's Housing Department received approximately $200,000 to $300,000 of the $2 million that HUD gave to Oak Park each year. (Def. 56.1 Resp. ¶ 7.) Through its Housing Department, Oak Park assisted its residents who could not afford the expensive renovations required to maintain their homes. (Def. 56.1 Resp. ¶ 9.) Based on the success of Oak Park's programs, HUD referred other communities to the Oak Park Housing Department as a model for the advancements it had made in diversity and code compliance efforts. (Def. 56.1 Resp. ¶ 8.)

As Housing Programs Manager, Breunlin oversaw Oak Park's Housing Department including projects such as the SFRP, the Security Improvement Grant, the "Barrie Park" Program, the Garage Replacement and Repair Program and the Diversity Assurance program. (Pl. 56.1 Resp. ¶ 4.) She was responsible for supervising, planning and coordinating the activities and operations of the Community Development Division and for providing the Community & Economic Development Director with staff assistance. (Def. 56.1 Resp. ¶ 2.) She participated in the development and

---

to comply with L.R. 56.1. That rule allows parties to file a statement of undisputed material fact consisting of short numbered paragraphs. Ignoring that obligation, each side has filed numerous lengthy paragraphs relating to a variety of unrelated or irrelevant topics that one cannot characterize as "short." Accordingly, the parties forced the Court to wade through convoluted, noncompliant Local Rule 56.1 submissions.

Nonconformity with the Local Rules and the standing orders of the Court is not without consequence. *Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 U.S. Dist. LEXIS 7569, at *8 (N.D. Ill. Apr. 29, 2004) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1). The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)). "A district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005). Accordingly, this Court will not consider portions of the parties' submissions that do not conform to L.R. 56.1

administration of the Community Development Division budget.  (Def. 56.1 Resp. ¶ 3.)  Breunlin

supervised Housing Department Supervisor Frank Pond, Community Development Technician Jeff

Leicht, Diversity Assurance Technician Charlie Fyfe and Administrative Assistant Sue Kornatowski.

(Pl. 56.1 Resp. ¶¶ 7-8.)  Pond was responsible for the SFRP, the Security Improvement Grant

Program, the Garage Repair Replacement Grant Program and the Barrie Park Investment and Loan

Grant Program.  (Pl. 56.1 Resp. ¶ 7.)  Leicht, who managed the day-to-day administration of the

SFRP beginning in August 2002, reported directly to Pond.  (Pl. 56.1 Resp. ¶ 8.)

During the first eighteen months of her employment, Breunlin reported to Village Planner

Dudley Underdonk.  (Pl. 56.1 Resp. ¶ 6.)  After that, she reported to Community Development

Director Rogene Hill ("Hill") until 2005, when Hill left Oak Park's Housing Department.  (*Id.*)

Breunlin then reported to Deputy Village Manager Peter Dame ("Dame") until his departure in 2006.

(*Id.*)  From 2006 until her termination on August 1, 2007, Breunlin reported to Deputy Village

Manager Lisa Shelley ("Shelley").  (*Id.*)

In 2000, HUD's Annual consolidation Action Plan gave Oak Park an outstanding rating for

use and management of federal funds.  (Def. 56.1 Resp. ¶ 10.)  The report also commended the

performance of Housing Department staff in implementing, managing and monitoring federally-

assisted housing programs in Oak Park during that time.  (*Id.*)

In 2002, due to new federal regulations, the SFRP added a lead abatement component to

reduce lead-based paint hazards in residential property.  (Pl. 56.1 Resp. ¶ 10.)  As a result of the new

federal regulations, Oak Park was required to do full lead abatement on any SFRP project over

$25,000 and partial lead abatement for any rehabilitation project under $25,000.  (Pl. 56.1 Resp. ¶

11.)  To fund the lead abatement projects, Oak Park administered a federal grant to pay for eligible

projects and administered a federally-funded low interest loan to pay for other rehabilitation work. (*Id.*)

Oak Park's Housing Program Advisory Committee ("HPAC"), a panel of volunteers from the community, received proposals for SFRP loans and lead abatement grants. (Pl. 56.1 Resp. ¶ 11.) After initial HPAC approval, the proposals went to the Oak Park's Village Board for approval. (Pl. 56.1 Resp. ¶ 12.) To prepare the Village Board for votes on pending proposals, the Housing Department staff prepared an Agenda Item Commentary for each proposal. (*Id.*) Because the members of the Village Board did not have expertise in running housing programs, they relied on Breunlin and her staff to interpret housing regulations and provide them with accurate information in the Agenda Item Commentaries so they could determine whether to approve the expenditure of Village and federal funds. (Pl. 56.1 Resp. ¶¶ 12-13.) Breunlin vouched for the truthfulness and accuracy of each Agenda Item Commentary by signing it before forwarding it to the Village Board for review. (Pl. 56.1 Resp. ¶ 13.)

From 1999-2003, Hill evaluated Breunlin as "Meets Expectations" or "Excellent." (Def. Add'l 56.1 Resp. ¶ 2.) From the start of her employment through May 2004, Breunlin accumulated several commendations and acknowledgments for her work. (Def. 56.1 Resp. ¶ 17.)

In May 2004, following a periodic inspection of SFRP files, the Cook County Department of Planning and Development stated that it found no concern, "indicating effective management of the program." (Def. 56.1 Resp. ¶ 11.) The report further noted that the SFRP's "[p]rogram records and files were maintained in an orderly, clear, and consistent fashion." (*Id.*) On several occasions, a local building owners' and managers' association asked Breunlin to speak at their meetings to describe the programs that Oak Park's Housing Department offered. (Def. 56.1 Resp. ¶ 14.) Over time, Breunlin

became a spokesperson for Oak Park's housing programs.  (Def. 56.1 Resp. ¶ 15.)  She attended national conferences, spoke at an American Planning Association meeting, conducted a tour of Housing Department project sites in Oak Park for attendees of a national housing meeting held in Chicago, and gave presentations about Oak Park's programs in Colorado, Ohio and New Jersey. (Def. 56.1 Resp. ¶¶ 15-16.)

## II. Problems Arise Within the SFRP

Over time, problems arose within the SFRP.  In 2004, Breunlin became aware of deficiencies in Leicht's performance in managing the day-to-day operations of the SFRP.  (Pl. 56.1 Resp. ¶ 14.) Specifically, she thought he was lazy, disorganized and had trouble getting along with homeowners. (*Id.*)  She noted a breakdown in communication between Leicht and his immediate supervisor, Pond. (*Id.*)  In her review of Leicht's performance, she described Leicht as having difficulty coordinating inspections alone, failing to communicate clearly to homeowners during projects, and preparing cost estimates and line items bids only after repeated requests.  (Def. 56.1 Add'l Resp. ¶ 13.)  Because neither Pond nor Breunlin had the authority to discipline Leicht without consulting Oak Park's Human Resources Department, Breunlin asked for authorization to discipline him on several occasions. (Def. Add'l 56.1 Resp. ¶ 11.)  In those instances, Village Management asked for more specific descriptions of Leicht's conduct.  (Def. Add'l 56.1 Resp. ¶¶ 12; 17.)

In Hill's 2004 performance evaluation of Breunlin, Hill stated that Breunlin "is very good at monitoring the program dollars and estimating the costs for the budget.  The records are well kept and reports are good . . . [Breunlin] is a good liaison to the Housing Programs Advisory Committee." (Def. Add'l 56.1 Resp. ¶ 3.)  However, Hill also commented that Breunlin "has a trusting style that works well with self disciplined employees.  Both Frank Pond and Sue Kornatowski are very self-

motivated and appreciate her confidence. Motivating, monitoring and documenting deficiencies for Charlie Fyfe and Jeff Leicht who do not demonstrate such traits is challenging for [Breunlin]." (Pl. 56.1 Resp. ¶ 15.) Breunlin agreed with Hill's assessment of her management. (*Id.*)

In May 2004, HUD issued its Assessment Report Summary, which evaluated Oak Park's federally funded housing programs. (Pl. 56.1 Resp. ¶ 16.) In the report, HUD raised concerns regarding the design of the SFRP. (*Id.*) Specifically, HUD recommended that Oak Park consider the following issues:

> 1. Are substantial rehabs including more than necessary code items that inflate costs significantly?
>
> 2. Should Oak Park perform full lead abatement on every property? Lead Based Paint Regulations do not require this.
>
> 3. Are lead and regular rehab costs simply too high? We did refer this question to our Lead Hazards and Healthy Homes Coordinator . . . who suggested that the Village's lead abatement costs may be significantly inflated.
>
> 4. Should temporary relocation units be abated or controlled? Who should be offered relocation?
>
> 5. Do all units need substantial rehab? The Village may wish to consider tiering assistance so that more units could be addressed. One tier could provide substantial rehab, another tier could address immediate life-safety issues, while another tier could be the emergency repair of one or more major systems.

(*Id.*) Also in 2004, the Village Board became concerned about the high expenses associated with the SFRP. (Pl. 56.1 Resp. ¶ 25.)

In March 2005, Pond discovered an abuse of the SFRP. (Pl. 56.1 Resp. ¶ 17.) At that time, Oak Park resident Frank Johnson received substantial rehabilitation and lead abatement under the SFRP. (*Id.*) Pond ordered an appraisal on the home, which revealed that the second floor of the

house received a significant expansion from a small attic to a full living space by raising the home's roof. (*Id.*) Additionally, the plumbing for a bathroom on the second floor had been "roughed in." (*Id.*) Upon inspection, Pond discovered that federal funds provided through the SFRP funded the work on Johnson's home. (*Id.*) Pond reported his findings to Breunlin and Dame.

In October 2005, a contractor reported to the Housing Department other problems with the SFRP. (Pl. 56.1 Resp. ¶ 18.) Robert Grimaudo ("Grimaudo"), owner of R&G Construction, a general contractor approved by Oak Park to perform rehabilitation and lead abatement work on SFRP projects, reported to Pond that Leicht had engaged in conduct that created unnecessary costs to Oak Park. (*Id.*) In response, Pond asked Grimaudo to make a written record of his concerns. (*Id.*) In the written statement, Grimaudo explained a discrepancy between the lead abatement price he quoted and the actual payout request from his lead subcontractor on a SFRP project at 838 S. East Avenue in Oak Park. (Pl. 56.1 Resp. ¶ 19.) Grimaudo stated that he prepared a sealed bid for that project which included a price quote for the lead abatement work and a price quote for the general rehabilitation price. (*Id.*) The quote for the lead abatement work was significantly lower than the quote for the rehabilitation work and his combined price represented the lowest bid. (*Id.*) Leicht told him that it would appear better to reverse the lead abatement and general rehabilitation figures because the other bidders for that project submitted higher figures for the lead abatement work than for the rehabilitation work. (*Id.*) Grimaudo expressed concern that he would have trouble paying his lead abatement subcontractor at the end of the project, but Leicht told Grimaudo to work it out with the subcontractor. (*Id.*) Leicht then filled out the paperwork for the project and asked Grimaudo to sign the form with the reversed lead abatement and general rehabilitation quotes. (*Id.*)

Grimaudo also explained that during completion of SFRP projects, contractors could create change orders to repair code violations that became apparent after the contractor began work on a project. (Pl. 56.1 Resp. ¶ 20.) Once a contractor initiated a change order, the SFRP would pay for the additional repair upon inspection and approval. (*Id.*) Grimaudo also noted that when he performed repairs at SFRP project sites, homeowners frequently asked him to make additional repairs that fell outside of the scope of the SFRP contract. (Pl. 56.1 Resp. ¶ 20.) The SFRP contract provided that the homeowners must pay for such repairs themselves. (*Id.*) However, in order to appease the homeowner, Leicht recommended that Grimaudo inflate the cost of his legitimate change orders to accommodate the homeowner's additional requests at Oak Park's expense. (*Id.*) In his report, Grimaudo stated "as the contractor, it does not matter to me who pays me for the work that I have completed, however, through Jeff Leicht's recommendations, I feel you need to be aware that this type of tactic is causing unnecessary costs to the Village." (*Id.*) Once Pond received Grimaudo's report, he informed Breunlin of the allegations against Leicht. (Pl. 56.1 Resp. ¶ 21.) While Breunlin did not know if Grimaudo's report was accurate, she took the allegations against Leicht seriously. (Pl. 56.1 Resp. ¶ 22.) Breunlin and Pond reported Grimaudo's allegations to Frank Spataro, Oak Park's Human Resources Director. (Pl. 56.1 Resp. ¶ 21.)

After receiving Grimaudo's report, the Human Resources Department ordered Pond and Breunlin to closely monitor Leicht. (*Id.*) Breunlin instituted weekly meetings with Leicht in late 2005, but Leicht refused to respond to her questions at these meetings. (Def. 56.1 Add'l Resp. ¶ 15.) Breunlin wanted to terminate Leicht, but she did not have the authority to do so. (Def. 56.1 Add'l Resp. ¶¶ 11, 16.) In his 2005 review, Leicht's performance review stated that Leicht did not communicate well with his supervisor, often made bad decisions, and did not use common sense.

(Def. 56.1 Add'l Resp. ¶ 14.)  The review noted that Leicht's performance had worsened from the previous year.  (*Id.*)

In 2005, Dame completed an evaluation of Breunlin's performance.  (Pl. 56.1 Resp. ¶ 23.) The evaluation noted that she developed the Housing Programs budget with little assistance and that she "successfully worked through a series of iterations with Village Manager's Office staff to develop a broad series of policy level performance indicators that should help to provide helpful information in the future to policymakers assessing Housing Programs."  (Def. 56.1 Resp. ¶ 19.)  He added that Breunlin's "overall performance is satisfactory, marked by exemplary efforts in some areas."  (Def. Add'l 56.1 Resp. ¶ 4.)  However, he also observed that the SFRP experienced unusual criticism during the last evaluation period.  (Pl. 56.1 Resp. ¶ 23.)  He noted that the Village Board questioned the high level of costs associated with the SFRP and that HUD conducted a detailed and critical monitoring of an extremely high cost project during its review of Oak Park's 2004 projects.  (*Id.*) Additionally, he stated that the SFRP received a high level of complaints regarding the administration of the program.  (*Id.*)  While he rated Breunlin's overall performance as satisfactory, he observed that "[a] primary factor affecting this year's review is the observation that [Breunlin] has been seemingly reluctant or unprepared to tackle these serious challenges head on with decisive leadership and direction."  (*Id.*)  Dame further noted in the evaluation that "HUD's review of the [SFRP] will require a complete overhaul of the program to comply with their findings" and that "the housing program's staff's response to initial inquiries of HUD was inadequate."  (Pl. 56.1 Resp. ¶ 24.)  Finally, Dame observed that "[e]ven before HUD began its extensive review of program expenditures for calendar year 2004, the [Village] Board, senior staff, and HUD's review from the prior year had questioned extremely high expenses associated with the [SFRP] and/or had recommended a strategic review."

(*Id.*)  Under the heading of "Personnel Administration," Dame reiterated Hill's concerns relating to

Breunlin's management style.  He stated:

> In last year's review, it was noted that [Breunlin's] management style
> was not well suited for motivating, monitoring and documenting
> deficiencies of certain personnel that were not "self-motivated."  This
> year, it appears that the issues relating to those problem employees are
> causing a significant amount of the problems being experienced,
> particularly in the [SFRP].

(Pl. 56.1 Resp. ¶ 26.)

*III.  Oak Park Investigates the SFRP*

As a result of Grimaudo's letter, Oak Park stopped using federal funds to support ongoing

SFRP projects.  (Pl. 56.1 Resp. ¶ 27.)  Because of that decision, the SFRP did not begin new

rehabilitation projects in 2006 or 2007 and a review of the SFRP and lead abatement grant program

began.  (Pl. 56.1 Resp. ¶¶ 27-28.)  To perform the review, Oak Park retained private investigator

William Keefe ("Keefe") of R.E. Walsh & Associates, Inc.  (*Id.*)  His initial investigation consisted

of a review of files related to five SFRP projects.  (Pl. 56.1 Resp. ¶ 29.)  He also interviewed

Grimaudo who provided Keefe with additional information.  (*Id.*)

In March 2006, Oak Park placed Leicht under police surveillance.  (Pl. 56.1 Resp. ¶ 32.)

During the course of the surveillance, on three separate occasions Oak Park Police Detective Mary

Byrne ("Byrne") observed that Leicht did not appear to be conducting official business during the

work day and that he spent a substantial portion of the workday outside of Oak Park limits.  (*Id.*)

Breunlin participated in an interview of Leicht regarding his conduct on the dates in question.  (*Id.*)

Oak Park suspended Leicht following the interview.  (*Id.*)  At the conclusion of the suspension,

Leicht resigned from his position.  (*Id.*)

On March 31, 2006, Keefe submitted a draft report summarizing the findings of his initial investigation to Deputy Village Manager Ray Wiggins. (Pl. 56.1 Resp. ¶ 34.) In the draft report, with respect to the SFRP, Keefe noted:

> This review found substantial evidence that the bid process was not competitive as represented to the Village Board and also as represented in the staff's response to HUD regarding HUD's finding of non-compliance for [the Johnson project]. Documents reviewed indicate that . . . Leicht, the program field manager, was pre-selecting contractor[s] prior to the final project specifications being written and manipulating the lead abatement costs to increase the overall amount of rehabilitation work that was limited under the guidelines of the rehabilitation loan program. Robert Grimaudo's allegations regarding the two projects that he was awarded are credible and supported by the results of this review . . . .

(Pl. 56.1 Resp. ¶ 35.) Keefe further noted that

> [w]hile the projects did adhere to [HUD's] underlying requirements, the amounts granted were unreasonable. It is unlikely that any uninterested party would view awards that approached the appraised value of the residence as proper. In a couple of instances it is possible that the entire residence could have been razed and a new one constructed for the amount spent . . . . This review indicates that the staff was operating under the perception that once lead was identified the entire residence had to be abated. The result was that the projects have provided a virtual rehabilitation of the residences, at the sole cost of a deferred loan or low interest loan to the recipient.

(Pl. 56.1 Resp. ¶ 36.)

*IV. New Oak Park Leadership Resumes the Investigation*

In 2006, the Village Board authorized an early retirement incentive for long-tenured employees. (Pl. 56.1 Resp. ¶ 33.) As a result, Oak Park experienced a large exodus of its management personnel. (*Id.*) Pond left his position of Housing Department Supervisor on March 24, 2006. (*Id.*) Shortly after Keefe submitted his draft report, Village Manger Carl Swenson and Deputy Village Manager Dame left their positions on April 7, 2006. (Pl. 56.1 Resp. ¶¶ 33, 37.)

Breunlin did not have sufficient years of service with Oak Park to utilize the early retirement incentive.  (Pl. 56.1 Resp. ¶ 33.)  Shelley replaced Dame as Deputy Village Manager and Breunlin reported directly to her.  (Pl. 56.1 Resp. ¶ 6.)

Tom Barwin became Oak Park's Village Manager in August 2006.  (Pl. 56.1 Resp. ¶ 38.)  He did not become aware of the problems within the SFRP until sometime in the Fall of 2006.  (*Id.*) Barwin learned that HUD had expressed concerns about the amount of money spent in a rather limited number of rehabilitation projects under the SFRP and that Breunlin had served as the Housing Program Manager at the time that HUD's concerns arose.  (*Id.*)

When Barwin heard that Swenson had initiated an investigation into the SFRP, he asked to see Keefe's report.  (*Id.*)  After reviewing the report in the Fall of 2006, Barwin concluded that major problems existed in the administration of Oak Park's housing programs and he informed the Village Board of the report's content.  (Pl. 56.1 Resp. ¶ 39.)  From reading Keefe's report, Barwin learned that under the SFRP, in one instance specific work requests had morphed into the complete rehabilitation of a home–a second story had been added to a house that only had rehabilitation work approved.  (Pl. 56.1 Resp. ¶ 41.)  Based upon Keefe's report, Barwin determined that the programs that Breunlin managed were not well administered and he had concerns about the costs of the SFRP. (Pl. 56.1 Resp. ¶ 40.)

Breunlin learned of Keefe's report when Barwin mentioned it to her in September or October of 2006.  (Pl. 56.1 Resp. ¶ 42.)  Barwin told Breunlin that based upon Keefe's report, some of the Village Board members "smelled blood" and would review the report in an executive session.  (*Id.*) A few days after that, Barwin asked Breunlin to come to his office so he could give her a full briefing on Keefe's report.  (Pl. 56.1 Resp. ¶ 43.)  Barwin also invited Shelley to attend the meeting.  (*Id.*)

During the meeting, Barwin provided Breunlin with a copy of Keefe's draft report. (*Id.*) He then told Breunlin that he decided to hold the Housing Program Manager accountable for the SFRP's problems, so Barwin asked Breunlin to serve a one week suspension. (Pl. 56.1 Resp. ¶¶ 40, 43.) He instructed Breunlin to work out the dates of the suspension with Shelley. (Pl. 56.1 Resp. ¶ 43.) Spataro then prepared Breunlin's suspension notice for Barwin's signature based on the information that Barwin provided to Spataro. (Pl. 56.1 Resp. ¶ 45.) Breunlin denies receiving the suspension notice. (*Id.*) After the meeting, Barwin asked Keefe to begin a second phase of his investigation to determine whether any of the problems within the SFRP constituted criminal wrongdoing. (Pl. 56.1 Resp. ¶ 46.) Barwin directed Keefe to work with Byrne on this part of the investigation. (*Id.*)

After her meeting with Barwin, Breunlin had the opportunity to review Keefe's report for the first time and she discovered allegations of wrongdoing within the Housing Department not previously known to her. (Pl. 56.1 Resp. ¶ 44.) For example, the report raised concerns about Pond's performance under Breunlin's supervision. (*Id.*) By the time Breunlin obtained this information, both Leicht and Pond had left their positions within the Housing Department. (*Id.*)

*V. Keefe's Investigation Continues*

To continue the second phase of his investigation, Keefe and Byrne examined project files from 2004 and 2005 to obtain information not available during Keefe's first review. (Pl. 56.1 Resp. ¶ 47.) They also expanded the investigation by interviewing contractors, former Housing Department staff, and current Housing department staff. (*Id.*) Keefe and Byrne conducted a lengthy interview of Breunlin that lasted for approximately two entire workdays. (Pl. 56.1 Resp. ¶ 48.) During the interview, Keefe and Byrne showed Breunlin documents from HUD files. (Pl. 56.1 Resp. ¶ 49.) At times, the interview became heated, with Keefe pounding a table and raising his voice. (Pl. 56.1

Resp. ¶ 48.)  Although Breunlin had previously assisted Keefe and Byrne in their investigation by collecting documents for them, this interview represented the first time that the investigators had questioned her at length about the documents.  (*Id.*)  When Breunlin could not answer all of their questions or respond to items in the files, Keefe and Byrne determined that Breunlin was either being evasive or did not have the knowledge to answer the questions.  (Pl. 56.1 Resp. ¶ 50.)

*VI.   Breunlin Requests a Leave of Absence*

After the last interview session with Keefe and Byrne ended on Monday, March 26, 2007, Breunlin did not feel well.  (Pl. 56.1 Resp. ¶ 52.)  The next day, Tuesday, March 27, 2007, Breunlin circulated a memorandum by email to Barwin, Shelley and Spataro.  (*Id.*)  In the memorandum, Breunlin stated, "I left yesterday totally unclear as to my role and the structure of the interviews.  I have felt isolated and somewhat harassed by this process." (*Id.*)  That same day, Breunlin left Shelley a voice mail in which she stated:

> I do have some concerns about my experience Friday and Monday.  It left me feeling very vulnerable and I would like to talk to you about that structure.  How things are proceeding is not clear to me, and I haven't been given much HR guidance around this.  So, yes, I look forward to a time to talk to you about it.

(*Id.*)  Additionally, Breunlin asked to review her personnel file that day.  (Pl. 56.1 Resp. ¶ 53.)  After that, on March 27, 2007, Breunlin requested a leave of absence due to stress and anxiety.  (Pl. 56.1 Resp. ¶ 54; Def. 56.1 Resp. ¶ 20.)  In response, Spataro submitted Form WH 380, Certification of Health Care Provider, to Breunlin's physician, Dr. Crystal Peoples ("Dr. Peoples").  (Pl. 56.1 Resp. ¶ 54.)  On Friday, March 30, Dr. Peoples faxed the completed Form WH 380 to Spataro, which indicated that Dr. Peoples took Breunlin under her care for stress and anxiety.  (*Id.*)  After receiving the completed Form WH 380, Spataro approved Breunlin's leave of absence on March 30.  (*Id.*)  On

March 31, 2007, Dr. Walter A. Pedemonte, Breunlin's treating psychiatrist, examined Breunlin and indicated that she suffered from Major Depressions with Generalized Anxiety Disorder, and would require sick leave from her job for the next thirty days. (Def. 56.1 Resp. ¶ 21.) The Village did not object to her leave of absence and Breunlin received compensation from Oak Park during her entire leave of absence. (Pl. 56.1 Resp. ¶ 54; Def. 56.1 Resp. ¶ 22.) Breunlin requested and received an extension of her medical leave. (Def. Add'l 56.1 Resp. ¶ 32.) Jackie Jamison, an Oak Park Human Resources employee, hand-delivered the paperwork for the extension to Breunlin's home. (*Id.*)

*VII. Keefe and Byrne Complete Their Investigation*

In June 2007, while Breunlin was still on medical leave, Keefe and Byrne submitted a written report summarizing the results of their investigation. (Pl. 56.1 Resp. ¶ 56; Def. 56.1 Resp. ¶ 25.) The report consisted of a twenty-one page summary with exhibits attached. (Pl. 56.1 Resp. ¶ 56.) The exhibits included Keefe's draft report from March 2006, notes from witnesses and copies of other documents that Keefe and Byrne used in writing the report. (*Id.*) The June 2007 report revealed more information than the March 2006 report regarding Breunlin's management and oversight of the SFRP. (Pl. 56.1 Resp. ¶ 57.) For example, the report indicated that Pond and Breunlin knowingly prepaid contractors for projects in violation of a Village Board Resolution that only authorized payment for SFRP projects upon completion. (Pl. 56.1 Resp. ¶¶ 51, 57.) The report also indicated that Pond and Breunlin encumbered a homeowner with unnecessary additional debt in the amount of $10,000, and in so doing, misrepresented the need for additional funding to the Village Board. (*Id.*) The first page of the report indicated that several issues remained open pending a final wrap-up interview with Breunlin, who referred requests for a final interview to her attorney. (Pl. 56.1 Resp.

¶ 59.)  Barwin provided a copy of the report to the Inspector General of HUD on June 29, 2007 while

Breunlin was on leave.  (Pl. 56.1 Resp. ¶ 58.)

*VIII.  Breunlin's Return from Leave and Termination*

On June 22, 2007, Spataro informed Breunlin that before she could return to work from her

leave, she must submit to a "fit for duty" examination by Oak Park's occupational health specialist,

Loyola Occupational Health.  (Def. 56.1 Resp. ¶ 23.)  On July 3, 2007, Breunlin contacted Spataro

to inform him of her belief that Oak Park did not have the authority to make its own determination

of her ability to return to work as a condition of her return.  (Def. 56.1 Resp. ¶ 24; Pl. 56.1 Resp. ¶

60.)  Oak Park subsequently withdrew its request.  (*Id*.)

At some point in July 2007, Oak Park informed Breunlin that she must attend a final wrap-up

interview with Keefe and Byrne at the Oak Park Police Department before she could return to work.

(Def. 56.1 Resp. ¶ 61; Def. Add'l 56.1 Resp. ¶ 32.)    She scheduled the interview for July 12, 2007.

(Def. 56.1 Resp. ¶ 62; Pl. 56.1 Resp. ¶ 26.)  On July 11, 2007, Oak Park informed Breunlin that she

could not return to work following the July 12 interview until she received permission from the

Village and that she would remain on the regular full-time payroll during that time.  (Pl. 56.1 Resp.

¶ 25.)

Breunlin attended the interview on July 12 with an attorney, Richard Jaffe.  (Pl. 56.1 Resp.

¶ 62.)   During the interview, Keefe and Byrne asked Breunlin questions regarding her job

responsibilities, the location of certain files and specific lead abatement projects.  (*Id.*)  The interview

also covered issues relating to prepayment of contractors in the SFRP, the diversion of lead

abatement funds to pay for the installation of a second story on a house and potentially false Agenda

Item Commentaries that Breunlin had signed.  (*Id.*)  Keefe also asked her about the payment of

Housing Department salaries from the Community Development Loan Fund 2020, a practice that the Village Community Development Director had determined to be improper. (*Id.*) In contrast to some of the earlier interviews, everyone present at this interview acted cordially towards each other. (*Id.*) Following the wrap-up interview with Breunlin, Byrne summarized the results of the interview in typewritten notes. (Pl. 56.1 Resp. ¶ 63.) After the interview, Jaffe told Breunlin that he thought Oak Park wanted to find someone to blame, that he thought Oak Park intended to fire her. (Def. 56.1 Resp. ¶ 29.)

The further investigation by Keefe and Byrne confirmed several items that appeared in Keefe's initial report. (Pl. 56.1 Resp. ¶ 64.) Barwin stated that the further investigation confirmed that Oak Park's Housing Department administered its programs poorly. (*Id.*) The new report also confirmed that the Housing Department failed to detect bid manipulation within the SFRP. (*Id.*) Through the new report, Barwin learned for the first time that the Housing Department had misrepresented facts to the Village Board about the Housing Program and that it had prepaid a contractor for work when the SFRP worked on a reimbursement basis only. (*Id.*) Barwin also received notification from HUD that it would require Oak Park to pay back almost $300,000 in funds paid to homeowners as a result of Oak Park's inability to demonstrate that the Village followed the correct process for income verification of grant recipients in the SFRP. (Pl. 56.1 Resp. ¶ 65.)

On July 25, 2005, Barwin send Breunlin a memorandum entitled "Notice of Termination Hearing." (Pl. 56.1 Resp. ¶ 66.) In the memorandum, Barwin advised Breunlin that Oak Park had made a determination that the significant challenges facing the Housing Programs Division required greater oversight and attention to detail and management accountability and that Breunlin had failed to provide that in the past and could not provide it in the future. (*Id.*) Barwin stated that he made a

tentative decision to end her employment with Oak Park based upon information he had learned

through the investigation into the SFRP. (*Id.*) He specified that Keefe and Byrne found that Breunlin

approved the prepayment of contractors in violation of Village Board resolutions and authorized

encumbering a homeowner with unnecessary debt of $10,000 without accurately representing to the

Board the need for the funding or ensuring that the homeowner knew the potential financial

repercussions of the additional funding. (*Id.*) Barwin informed Breunlin in the memorandum that

these incidents and others revealed a pattern of mismanagement and neglect that could result in

sanctions from HUD. (*Id.*) The Notice of Termination advised Breunlin that she could respond to

the memorandum by providing additional information before Oak Park finalized its decision at a

meeting scheduled for Wednesday, August 1, 2007 at 10:00 a.m. (Pl. 56.1 Resp. ¶ 67.) Breunlin

received the Notice of Termination at her home along with a proposed severance agreement and a

cover letter that provided her with the option of resigning her employment in lieu of termination in

exchange for two months of severance pay. (Pl. 56.1 Resp. ¶ 68.)

Breunlin attended the August 1st meeting with her attorney. (Pl. 56.1 Resp. ¶ 69.) Barwin,

Spataro and Oak Park's outside counsel, Michael Warner, represented Oak Park in the meeting. (*Id.*)

At the meeting, Breunlin had the opportunity to state the reasons that Oak Park should not terminate

her employment. (*Id.*) During a break in the meeting, Oak Park offered to increase its severance

offer to three months but Breunlin rejected that offer. (Pl. 56.1 Resp. ¶ 70.) When the meeting

resumed, Oak Park gave Breunlin a written notice confirming the termination of her employment

indicating "unsatisfactory performance" and mismanagement of the SFRP "that may result in HUD

imposing sanctions of approximately $300,000 or more." (Pl. 56.1 Resp. ¶ 70; Def. 56.1 Resp. ¶ 30.)

Breunlin claims that Oak Park terminated her because she took FMLA leave in 2007. (Pl. 56.1 Resp. ¶ 70.)

**STANDARD OF REVIEW**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

**DISCUSSION**

The FMLA prohibits employers from discriminating against employees who take leave under the Act. *See* 29 U.S.C. § 2615. "In cases such as this where an employee is terminated while taking FMLA leave, the trial court must determine whether the termination was illegally motivated by the employee's choice to take leave, or whether the termination was motivated by other, valid reasons." *Phelan v. City of Chicago*, 374 F.3d 679, 683 (7th Cir. 2003). "Clearly, an employee may not be fired because she took leave – that would be in direct violation of the statute. However, an employee may be fired for poor performance when she would have been fired for such performance even absent her leave." *Id.*

To survive a motion for summary judgment on a claim of retaliation under the FMLA, a plaintiff must submit evidence showing that the employer terminated her because she took valid leave using either the direct or indirect method of proof. *See Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 667 (7th Cir. 2008). "Under the direct method, a plaintiff must present evidence that her employer took a materially adverse action against her on account of her protected activity." *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008). To prevail under the direct method, a plaintiff must present evidence of: 1) a statutorily protected activity; 2) a materially adverse action taken by the employer; and 3) a causal connection between the two. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008).

Under the indirect method, an employee must first establish a prima facie case by proving that she: 1) engaged in a statutorily protected activity; 2) met her employer's legitimate expectations; 3) suffered an adverse employment action; and 4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.* Once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the employer to produce a non-

discriminatory reason for its action. *Id.* After the employer has produced a non-discriminatory reason for the action, the burden of production shifts back to the employee to demonstrate that the proffered reason is pretextual. *Id.*

*I. Breunlin's Motion for Partial Summary Judgment*

In her motion for partial summary judgment, Breunlin does not ask for judgment on her retaliatory discharge claim; rather, Breunlin asks this Court for judgment only on the "limited issues that: a) Plaintiff is a member of a statutorily protected group; [and] 2) Plaintiff suffered an adverse employment action." Therefore, her motion for partial summary judgment only asks for judgment on two of the elements of her retaliation claim under the direct method of proof.

Fed. R. Civ. P. 56 does not authorize this Court to grant summary judgment with respect to certain elements of a claim; instead, a court may only grant summary judgment for an entire claim. *See Biggins v. Oltmer Iron Works*, 154 F.2d 214, 217 (7th Cir. 1946) ("[S]ummary judgment is not contemplated or authorized for any portion of a claim less than the whole."); *see also Commonwealth Ins. Co. of N.Y. v. O. Henry Tent & Awning Co.*, 266 F.2d 200, 201-02 (7th Cir. 1959). Because Breunlin's motion for partial summary judgment does not seek judgment on her entire claim, the motion is denied.

*II. Oak Park's Motion for Summary Judgment*

    a. Direct Method

As previously stated, to survive summary judgment under the direct method, the plaintiff must present evidence of: 1) a statutorily protected activity; 2) a materially adverse action taken by the employer; and 3) a causal connection between the two. *Caskey*, 535 F.3d at 593. To establish those elements, a plaintiff may use direct evidence or circumstantial evidence. *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). "A plaintiff can prevail under the direct method by showing an admission of discrimination or by 'constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" *Ridings*, 537

F.3d at 771. Circumstantial evidence can include suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus, pretext and other evidence which allows the jury to reasonably infer retaliation. *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (*citing Yong-Qian Sun v. Bd. of Trs.*, 473 F.3d 799, 812 (7th Cir. 2007)). Once the plaintiff has established a prima facie case of retaliation under the direct method, "[i]f the plaintiff's evidence is thereafter contradicted, the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive . . . ." *Ridings*, 537 F.3d at 771.

Because Breunlin does not present direct evidence of retaliation, she must rely upon circumstantial evidence to show that her FMLA leave "was a substantial or motivating factor in the employer's decision." *Lewis v. Sch. Dist. No. 70*, 523 F.3d 730, 742-43 (7th Cir. 2008). For the purposes of summary judgment, Oak Park concedes the first two elements of Breunlin's prima facie case – that she engaged in a statutorily protected activity and that her termination constituted an adverse employment action. Therefore, the Court must evaluate whether the record shows a causal connection between Breunlin's FMLA leave and her termination.

Breunlin contends that Barwin resented her for taking FMLA leave. To support the inference that her leave motivated his decision to terminate her, she points to the following evidence: 1) Barwin terminated her either while she was on leave or within a few days of her return; 2) Barwin required her to complete an interview with Keefe and Byrne before she could return to her position; 3) Barwin, rather than Shelley, Breunlin's immediate supervisor, initiated the termination; 4) Oak Park "harassed" her during her leave by asking her to submit to a "fit for duty exam" and delivering the FMLA paperwork granting her an extension of time on her leave to her home on one occasion; and

5) the Human Resources Department at Oak Park did not have issues with Breunlin's performance in 2006 or 2007.

Breunlin first claims that Oak Park's requirement that she report for a fitness exam is evidence of retaliatory intent. Under the FMLA, however, Oak Park had a right to ask Breunlin to submit to a "fit-for-duty" examination prior to her return from FMLA leave. *See* 29 C.F.R. § 825.310(a). The record contains no evidence that would permit an inference that Oak Park or Barwin singled out Breunlin by asking her to undergo the examination before returning to work. Therefore, asking her to undergo a "fit-for-duty" examination does not support her contention that the defendant intentionally retaliated against her by ordering an exam that the law allows it to conduct. *See Ridings*, 537 F.3d at 772 ("An employer cannot be deemed to retaliate against an employee by asking her to fulfill her obligations under the FMLA.").

Breunlin next alleges that the delivery of documents to her home supports her belief that Oak Park retaliated against her since that delivery "harassed" her. The record, however, does not provide support for this contention. The record shows that Jamison dropped off the documents in order for Breunlin to complete the required paperwork to extend her FMLA leave. Nothing indicates that anyone from Oak Park repeatedly visited Breunlin's home during her leave or that Jamison did anything to intimidate or harass Breunlin during her stop. In fact, the delivery of the documents enabled Breunlin to extend her leave beyond the amount that had already been granted. If anything, the delivery of the extension documents served to aid Breunlin by not requiring her to come in to the office for the paperwork and by providing those documents to her in a timely fashion. This one-time act cannot constitute evidence of retaliatory intent when it was a benefit to Breunlin.

Breunlin claims that the fact that Barwin, rather than Shelley, initiated her termination is proof of the defendant's retaliatory intent. Although Breunlin reported directly to Shelley, Barwin oversaw all employees within the Housing Department. Barwin took an active approach in the management and investigation of the SFRP beginning with his replacement of Dame as Village Manager in August 2006, approximately eight months before Breunlin took FMLA leave. Once Barwin learned of the investigation into the SFRP, he reviewed Keefe's initial report and informed Breunlin of the report's contents. At that time, he decided to place Breunlin on a one-week suspension to hold her accountable for the SFRP's problems. After informing Breunlin of the suspension, Barwin contacted Keefe and asked him to begin a second phase of the investigation. Therefore, the record shows that Barwin assumed an active role in the oversight of the SFRP from the moment he assumed the role of Village Manager, well before Breunlin took FMLA leave. His continued direct involvement in the program's oversight during Breunlin's leave of absence was not inconsistent with this direct involvement in the program nor was Barwin acting outside of the scope of his powers in initiating her termination. Because he was permitted to oversee the investigation and his actions did not violate any rules of the Village, Breunlin cannot support her claim of retaliatory intent with evidence of Barwin acting within his power by initiating her dismissal.

Breunlin next contends that because she was required to be interviewed by Keefe during the FMLA period, this is reflective of the defendant's retaliatory intent. The record shows that the investigation into the SFRP continued while Breunlin took her leave of absence. During Breunlin's absence, Keefe and Byrne uncovered additional evidence of wrongdoing within the Housing Department, such as improper payment of salaries from the Community Development Loan Fund 2020. Because Keefe and Byrne did not have the opportunity to question Breunlin about those

matters before her leave, Barwin had Breunlin attend the final wrap-up interview to complete the investigation. Requiring Breunlin to attend the interview before returning to work allowed Keefe and Byrne to complete their investigation, which began well before Breunlin took her leave of absence. The wrap-up interview occurred in order for the Village to finalize its decision regarding actions that began long before Breunlin took her leave. Defendants requested the interview and gave Breunlin the opportunity to select the date of the interview. She was also permitted to present her version of the events at this meeting and was given an opportunity to have her attorney present. Breunlin never asked to delay the interview due to her leave. In fact, she selected the date and appeared with an attorney. This cooperative process wherein the Village did not force her to attend the meeting but rather allowed her to select the date, be represented, and submit evidence to support her position is not reflective of retaliatory intent.

Breunlin next points to her performance in 2006 and 2007 as circumstantial evidence of Barwin's retaliatory motive. The record shows that in 2006 and 2007, Shelley did not criticize Breunlin's performance in her annual evaluations. Yet, in 2006, the record also shows that Barwin began to question Breunlin's management ability when he learned of Keefe's investigation into the SFRP. Barwin suspended her in 2006 within a few months of becoming Village Manager. Barwin determined that the second report, issued in 2007, confirmed that Oak Park's Housing Department administered its programs poorly and failed to detect bid manipulation that had occurred with the SFRP. While the report related to events that occurred in 2004 and 2005, Barwin did not realize the full extent of the problems within the SFRP until Keefe and Byrne issued their second report in 2007. Even if Breunlin met Shelley's expectations in 2006 and 2007, Barwin had begun to question Breunlin's management ability in 2006 when he learned of mismanagment within the SFRP that

dated back to 2004.  Because he did not learn the full extent of the problems within the SFRP until

2007, Breunlin's performance evaluations from 2006 and 2007, which criticized Breunlin's

performance in earlier years, do not provide circumstantial evidence of a retaliatory motive. *See e.g.,*

*Kohls v. Beverly Enter. Wisc., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001) (finding no inference of

retaliatory motive when "employer did not discover many of the deficiencies in [Plaintiff's] work .

. . until after [Plaintiff] took leave.  The fact that the leave permitted the employer to discover the

problems can not logically be a bar to the employer's ability to fire the deficient employee.").

Breunlin claims that, the timing of her termination provides circumstantial evidence of a

retaliatory motive.  "Close temporal proximity provides evidence of causation and may permit a

plaintiff to survive summary judgment *provided that there is other evidence that supports the*

*inference of a causal link*."  *Scaife v. Cook County*, 446 F.3d 735, 742 (7th Cir. 2006) (emphasis

added).  As noted above, Breunlin's other circumstantial does not support an inference of a causal

link between her FMLA leave and her termination.  In some situations, the timing of a decision could

lead a fact finder to infer that the employee would not have been terminated absent her taking of

leave. *See Kohls*, 259 F.3d at 806.  "[I]f, for example, a supervisor who had been aware of problems

with an employee did not decide to fire the employee until she took leave, and the supervisor based

the firing on the incidents of which the employer had already been aware," a fact finder could infer

that the employee had been terminated for taking leave. *Id.*  Here, although Barwin became aware

of Breunlin's problems managing the SFRP before her leave, he discovered additional evidence of

the full extent of her performance problems during her leave.  Based on the second report that Keefe

and Byrne issued, Barwin learned for the first time that the Housing Department had misrepresented

facts to the Village Board about the Housing Program and that it had prepaid a contractor for work

when the SFRP worked on a reimbursement basis only. During Breunlin's leave, Barwin received notification from HUD that it would require Oak Park to repay approximately $300,000 in funds paid to homeowners as a result of Oak Park's inability to demonstrate that the Village followed the correct process for income verification of grant recipients in the SFRP. As in *Kohls*, "it is clear that [Barwin] did not discover many of the deficiencies in [Breunlin's] work . . . until after [Breunlin] took leave." *Id.* Here, the timing of Breunlin's termination does not permit an inference of retaliation, because the decision came on the heels of further discovery of Breunlin's mismanagement of Oak Park's Housing Department programs. *See e.g., Phelan*, 347 F.3d at 684 ("The employer would have been entitled to fire the employee for mismanagement . . . regardless of whether she had taken leave or not. . . . . Hence, it is not in violation of the FMLA for the City to dismiss [the plaintiff] for poor performance, regardless of when the City came to that decision."). Because Breunlin's offered circumstantial evidence does not permit an inference of a causal link between her FMLA leave and her termination, she has failed to present a prima facie case under the direct method.

Even if Breunlin could make a prima facie case under the direct method, Oak Park has produced unrebutted evidence that it would have terminated Breunlin even if it had no retaliatory motive. Once the defendant presents a legitimate, non-discriminatory reason for terminating employment, the plaintiff bears the burden of producing evidence that the reason is pretextual. *See Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 711 (7th Cir. 2002). Pretext "means a lie, specifically, a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). "On the issue of pretext, [the Court's] only concern is the honesty of the employer's explanation." *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001) (*quoting O'Connor v. DePaul Univ.*, 123 F.3d 665, 671 (7th Cir. 1997)).

The record shows that Barwin decided to terminate Breunlin for mismanagement of Oak Park's Housing Department based upon information that he had learned through the investigation into the SFRP. The unrebutted evidence in the record shows that Keefe's report concluded that Oak Park had poorly managed housing programs, that the Housing Department failed to detect bid manipulation within the SFRP, that the Housing Department misrepresented facts to the Village Board about the Housing Program and that it had prepaid a contractor for work when the SFRP worked on a reimbursement basis only. Barwin stated that in making his decision he determined that a pattern of mismanagement and neglect existed within the Housing Department based upon the report's findings that Breunlin approved the prepayment of contractors in violation of Village Board resolutions and authorized encumbering a homeowner with unnecessary debt of $10,000 without accurately representing to the Board the need for the funding or ensuring that the homeowner knew the potential financial repercussions of the additional funding. Additionally, immediately before Barwin made the decision to terminate Breunlin, Oak Park had received notification from HUD that the Village had to repay approximately $300,000 in funds due to the mismanagement that occurred within the SFRP. The record shows that Barwin relied upon the report in holding Breunlin accountable for the mismanagement within the Housing Department. Because the Village was entitled to fire Breunlin for mismanagement regardless of whether she had taken leave or not, their actions cannot be deemed pretextual. *See e.g., Phelan*, 347 F.3d at 684.

In an effort to challenge to Barwin's assertions that he relied upon the investigative report in terminating her, Breunlin attempts to contradict the report's findings. Instead of attacking his reason for terminating her, Breunlin attacks the report as incomplete and inaccurate. She has not rebutted the uncontested fact that Barwin relied upon the report in good faith when deciding to terminate

Breunlin's employment. The issue is not whether Keefe and Byrne performed an adequate investigation; rather, the issue is whether Barwin honestly believed that he terminated Breunlin based on the findings in the report. *See Russell*, 51 F.3d at 69 (finding that the ultimate issue "was the honesty of the company's belief" in the employee's inadequate performance rather than the adequacy of the employee's performance). The undisputed evidence shows that Barwin made the decision to terminate Breunlin based on an independent report that indicated Breunlin mismanaged Oak Park's Housing Department. Breunlin has not pointed to evidence in the record that could call the honesty of Barwin's belief into question. Because Breunlin fails to provide evidence that Oak Park's stated reason for terminating Breunlin is pretextual, even if she could establish a prima facie case of retaliation under the direct method, Oak Park is entitled to summary judgment on her FMLA retaliation claim.

b. Indirect Method

Breunlin also attempts to prove a prima facie case of FMLA retaliation under the indirect method. To proceed under the indirect method of proof, Breunlin must show: 1) a statutorily protected activity; 2) that she met her employer's legitimate expectations; 3) she suffered an adverse employment action; and 4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *See Caskey*, 535 F.3d at 593. If she establishes a prima facie case of retaliation, "the burden shifts to the employer to produce a non-discriminatory reason for its action; if the employer meets this burden, the burden shifts back to the employee to demonstrate that the proffered reason is pretextual." *Id.*

Even if Breunlin could establish that she met her employer's legitimate expectations, she cannot establish a prima facie case of retaliation under the indirect method because she has not

identified a similarly situated employee who did not engage in statutorily protected activity.  "[T]o satisfy the 'similarly situated' prong of the prima facie case, an employee must be 'directly comparable in all material respects . . . .  This requires the plaintiff to show not only that the employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also show that there were no 'differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them.'"  *Ineichen v. Ameritech, Inc.*, 410 F.3d 956, 960-61 (7th Cir. 2005) (citations omitted).  Breunlin points to her immediate supervisor, Shelley, as a similarly situated individual who did not take FMLA leave.  However, the record shows that Shelley did not join Oak Park's Housing Department until 2006.  Therefore, Shelley did not work for the Housing Department in 2004 and 2005, the period detailed in Keefe and Byrne's report that provided the basis for Barwin's determination that Breunlin had mismanaged Housing Department programs.  The Housing Department did not employ Shelley at the same time that Breunlin's mismanagement triggered an investigation, leading to the eventual repayment of $300,000 in grant money to HUD.  Because Shelley did not work for the Housing Department during the period that led to the investigation of Oak Park's SFRP, differentiating or mitigating circumstances exist that distinguish Barwin's treatment of Shelley and Breunlin.  Therefore, Shelley is not directly comparable to Breunlin in all material respects.  Because Breunlin has not identified a similarly situated employee within the Housing Department who did not engage in statutorily protected activity, she cannot state a prima facie case of discrimination under the indirect method.  *See Mitchell v. Dutchment Mfg., Inc.*, 389 F.3d 746, 750 (7th Cir. 2004) ("Failure to satisfy any one element of the prima facie case dooms an employee's retaliation claim.").

Even if Breunlin could establish a prima facie case of retaliation using the indirect method, Oak Park would be entitled to summary judgment on her claim because, as previously discussed, Breunlin has not put forth evidence that could prove that Oak Park's explanation for Breunlin's termination is pretextual. Therefore, the undisputed facts show that Oak Park is entitled to judgment as a matter of law. Accordingly, its motion for summary judgment is granted.

## CONCLUSION AND ORDER

For the reasons stated herein, Breunlin's motion for partial summary judgment is denied and Oak Park's motion for summary judgment is granted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:   December 2, 2008